This case is number 06-5114, Chemical Separation v. United States Mr. Kenny. Thank you, Your Honor. My name is Bill Kenny. I'm here on behalf of the Appellants, Chemical Separation Technology in San Francisco, who have requested this court to reverse the trial court, the Court of Federal Claims' decision that there was no infringement of two patents owned by the appellants. Now, we understand the issues, and in view of the shortness of time, do concentrate on your best arguments. Thank you, Your Honor. There's principally two areas that we want to address. The first is a clear error of the law, and this relates to what's referred to in this case as the PITS system, the Portable Interim Treatment System, which is a physical embodiment of the apparatus patent, the 497 patent, for treatment of asinine drainage. In this case, the defendants conceded that there was a license in their motion for summary judgment, a pleading for the trial court. The trial court twice memorialized this judicial omission. It memorialized it in its opinion on summary judgment, saying, thus, while the 497 patent anticipated treating up to 500 gallons per minute. Well, this wasn't an express license, was it? It's an implied license resulting from sale. And unless there is an express restriction, and we've seen some of them, it's an exhaustion, isn't it? The way I would answer that is this. If this court is to determine that the United States is not bound by its judicial omission, and that no such license— What was the omission? That we have an express license which gives us certain rights and puts certain restrictions on it? Or are they saying that they have a license, an implied license, by virtue of the sale of the apparatus? I think that's what the upellies are articulating in this court at this time. Well, do you have any express license to show us otherwise? I have the court's memorialization of their judicial omission in a written opinion, wherein the court says the pen system— But a written opinion expressing essentially the exhaustion principle is not a written license between two parties. Show me where the— I would draw your attention to page 15 of my brief. Page 15? Page 15. How about the court's decision? The court's decision—that's where I'm citing it, Your Honor. I'm actually quoting language from that decision with a citation to it. But I'd like to see it in context, in the court's opinion. The context—I believe that's attached, Your Honor. Well, it is, but tell me what page and line. It sounds like it's rather basic to your argument. Footnote 14, you mean? I beg your pardon, Your Honor? Are you talking about the footnote in the court's decision? Yes, Your Honor. The pen system is sold under a license to treat 100 gallons per minute and to precipitate out 40 gallons. Where is this, Mr. Kinney, in the appendix? That's what we were looking for. Yeah, I apologize. I'm citing the actual reported opinion, which is at 45, Fed Claim 513 at page 515. Judge Lowry, getting to your point, if the score is not defined that there is a judicially-admitted license by the defendants, the question then becomes, was there an agreement? And then the question becomes, is it an enforceable agreement if it's not in specific writing? What's the difference between an agreement and an express writing? An express agreement in writing and an oral agreement, which is being memorialized repeatedly by the parties in this action throughout this litigation up until the point of the infringement when we get an about-face. And now we're confronted with, oh, well, there is no agreement. There is no understanding. And this then plays into this repair and reconstruction idea. Which brings us to the Supreme Court decision, which is, and you know which one I'm referring to. The Wilbur case. The Wilbur case. Yeah, Wilbur Ellis, yeah, which says enlargement of the apparatus is not reconstruction. I think that this becomes factual specific. This is a water treatment apparatus. This is designed to treat a specific volume of water, as understood by all the parties, indeed the court, throughout this entire litigation. 497 is an apparatus patent. 800 is a method patent. We have a specific apparatus delivered to this site prior to the defendant's appellee's involvement, and it's doing a specific job. It's got a 2,000-gallon tank, and it's got influent pipes, as called out for by the patent, and effluent pipes. These are the pipes that were changed. And they were changed, albeit only in capacity. There's nothing wrong with them. They wanted increased capacity, as you put it, Judge Lowry, in enlargement. But how is this different under these facts from just recreating the entire thing and building a new system right next to it? I'm only increasing capacity. You sold me the patent. What's the difference? Well, the difference is obvious. If they recreated the entire thing, it would be clearly infringement. But here they're recreating the effect of the entire patent as sold to them by its limitations, by its design, and they're increasing capacity of the effect of what they bargained for, what they purchased, under circumstances where all the parties appreciate there's a limitation. How much was the capacity increased? It was increased, Your Honor, in stages. It was 100 gallons a minute, and it went up to 450 gallons a minute at times. This is on a 2,000-gallon reactor tank. And we're not contending that the reactor tank was touched on the interior at all. What we are contending is that that increase in the capacity by changing the influence in effluent pipes was basically a duplication of the patent, of that which was given to them, sold to them, that which they bargained for. They got more than they bargained for, and my client got hung up to drop. That's the simple. If we want to ignore their judicial admissions, we want to ignore the trial court memorializing it twice. That's what it comes down to from our perspective. We then move on to the clearly erroneous findings of fact. In this, I think it's really important for the court to appreciate this. This was tried before the court over a week. There was 378 exhibits. Neither Mrs. Mitchell, God bless her, or myself are computer proficient enough to have presented electronic evidence to the court, so we have six sets of over 25-inch binders of documents. These were moved in on mounts to the court. The bulk of them contain the Superfund record, the documents of the defendants, their treatment data. The trial court rejected Dr. Roth's equivalence arguments, saying that he wasn't specific enough. The evidence of what was going on out there was essentially this, and I'll put it first in context of the 800 patent. Mr. Kennedy, you continue to refer to this license. I found what I was looking for. The trial court says the ordinary rule is that absent an express limitation, the sale of patented items carries with it an applied license to use in any fashion the purchaser deems fit. As Mr. Stevenson readily admitted, the relevant sale documents neither limit the flowage rate nor the amount of copper that could be derived from. Doesn't that settle your license argument? No, it does not, Your Honor, because if it's not expressed, why are we all talking about it? Because you're talking about a limitation. A limitation's got to be expressed when you're talking about an applied license. An applied license is freedom. I understand the distinction you're drawing, Your Honor. I guess what I'm trying to point out to you is why is everybody talking about the specific limitations? Because you're arguing that. I'm arguing it. They're conceding it. It's memorialized in two opinions of the trial court. I thought your concern was that the equipment was physically enlarged and that was a kind of reconstruction, not that they increased the capacity by increasing the throughput or whatever other reasons might have been use of the original equipment. Did I misunderstand your argument? I'm sorry, Your Honor. Could you start the first part of that? I thought that what you were arguing was essentially reconstruction by the physical enlargement of the equipment, not that the throughput capacity was increased just by running it longer or faster. Well, it's important to understand this is a continuous operation. This isn't something that they—well, at times they were running it intermittently, but the portable interim treatment system is capable of being run full-fledged. If they had not changed the pipes, I would agree, Your Honor, there would be no infringement because they could have just used it as it was there and run it through if we ignore the fact that there was an express limitation that everybody recognized. Mr. Kane, let me ask you, does your case stand or fall on us accepting your argument that there was the kind of license you've described? No, Your Honor. As to the pits, it would. As to the pit systems infringement of the 497 and 800 patent, yes, Your Honor, that would be a correct statement. As to the balance of the infringing plants on that site, that is not accurate. Well, now you're getting into the drain and the adit and the other— Yes, Your Honor. But the thing is, I mean, the trial judge sat through the trial. It's an exhaustive opinion, explains why he made the findings of fact he did, made credibility determinations. And while you have very capably presented arguments as to why facts should have been found the other way, I don't—I'm having difficulty respectfully seeing how you've established that he was wrong in his fact findings. Your Honor, if I could address two things that I think would bring this to light. I feel like Sisyphus throughout this entire case, 10 years, we're going to have this. There are Medusa—as the trial court acknowledged, there are Medusa-like challenges to the validity of these patents. Read the trial court's destruction. You must feel like Hercules. I don't. I feel very tired, Judge. Very tired. The defendants will tell you that we failed to prove one of the limitations in the 800 Act. Specifically, they'll tell you that we failed to prove the rate of aeration. Mr. Kennedy, you're making what you said sounds like a very good beginning of an argument to a jury. But what I'm looking for is tell me where the judges—don't worry about what they said or will say—where are the judges' findings of fact clearly erroneous? That's what you have to specifically point to. The court agreed with them that we failed to prove the limitation of a rate of aeration, Your Honor. There is no such limitation by the court's own decision. And I apologize, I have the Lexis printout on this page. This is the trial court's decision on the marking in the literary hearing. In reading the aeration rates, the claim— Where is this? This is the court's discussion at 51 Fed Circuit 771 at page 782. And it's headed number three, claim one, and it's referring to the 800 Act. Okay? Which is claim 22. There is evidence, Judge Shaw, there is evidence in the record. There are documents showing the use of anionic polymers. For me to meet claim 22's limitations, I need to show anionic polymer use for settling purposes and the limitations of the invalidated claim one. Because of the on-sale bar under this opinion, but it's because it's an independent claim, I have to prove these limitations. As part of that, I have to prove, according to them and according to the trial court, that I meet this limitation of a rate of aeration. On this point, the court ruled previously, and these defendants have not appealed this point, this court ruled that this language, specifically, aerated and said reaction tank to provide dissolved oxygen concentration at from about 0.01 pounds per hour to about 70 pounds per hour, rate of aeration. This is the language everybody is referring to as the rate of aeration. This is what the trial court said in its construction. In conjunction with that portion of the claim that recites gallonage and milligram ranges, refers to a rate of aeration and that the ranges so specified were not intended as limitations on the patent. So how am I to argue this? I'm being told I'm not meeting a limitation, but I'm being told it doesn't exist. I don't understand. There was an aeration requirement. Yeah, I agree. And on that point, you look at my brief and talk about Dan DuPont's testimony during the Markman hearing, where he concedes, essentially, that ambient air, one skill in the art of recognizing, depending upon the metal's concentration in the waste stream, would be the determining factor to determine what rate of aeration you would want to achieve the simultaneous reaction that you're trying to achieve with this patent. You're not stuck with this rate of aeration. You don't have to have a rate of aeration. The waste stream is going to define it. Copper, as I recall from the Markman testimony, didn't require aeration. Iron would require aeration. So if I have a copper-laden stream and the patent calls out to treat a waste stream with copper, I don't need any aeration. And indeed, 0.01 pounds per hour is ambient air, effectively. It's such a minimal amount of air that it's effectively no introduction of air. And this is all dependent, as understood by the court, and I've cited the court's Markman hearing and what he talked about with Mr. DuPont's attempt to create this limitation, which he rejected. This goes again to another point, Judge Shaw, that you want something from me. You don't want a jury argument. You don't want me to be here at trial term. You want something from me to tell you why is the judge clearly erroneous. That's what the standard we have to meet. I understand that, Your Honor. And that's one. Another one is this. The defendants argued, once we got the infringement case, that as to the 497 patent, we were required to establish containment as identified in pipes 9, 18, 21, and 22 in the specifications of that patent. In the Markman validity opinion, the judge specifically rejected that and said, no, the influent pipe does not contain those four points. It only contains 9, 18. But here we are at the infringement trial, arguing about this containment. Another example is this, this two tanks in series argument. Our position was, if you have the reaction occurring in one tank, it doesn't matter if you have another tank next to it doing the same thing. The question is, does that tank meet the limitations of the 800 patent and 497 patent? And I'll concede to this court, as to the 497 patent, the literal infringement, it's a very specific structure. As a matter of fact, it's an aeration industry's aerator. It's a very specific kind of structure that's occurring there. And as to all these systems, only the pits contain that. As to a doctrine of equivalence, it's less persuasive than with the 800. But when you have a shaft with a mixer that's incorporating air and drawing it in, and it's admitted by their own experts, you have the limitations of the 800 patent and potentially the limitations of the 497. The equivalent, functional equivalence. I need to interrupt you because we're well over time. Let's hear from the other side, and we'll save you rebuttal time. Thank you. Ms. Mitchell? Your Honor, may it please the Court? I would like to address some of the issues that were raised in Mr. Kinney's discussion with the Court. And Judge Lori talked about the fact that there was no express limitation on the license, on any type of license for the pit system, and that's exactly correct. What the government has argued and certainly presented to the trial court was that if we did say that we had an implied license as a matter of law to use the pit system, there was no express restriction at all in the use of that system. Therefore, we were allowed to repair it. And the only restriction on that license by law is that we cannot reconstruct that system. The trial court, and let me point the Court, and this is in the trial court's opinion for non-infringement in footnote 34 on page 24 of the slip opinion. The trial court talks about being aware of that. Footnote which? I'm sorry, footnote 34 on page 24 of the trial court's slip opinion. The Court basically stated in the earlier stages of the case for summary judgment purposes, the Court assumed there was a summary gallon per minute limit just for those purposes, but certainly realized that that had not been shown, that was not presented to the Court as a factual issue at that time, and certainly knew, said that the plaintiffs were well aware that this was an issue for trial, and the government showed that there was certainly an implied license with absolutely no restriction. None of the sale documents show any type of restriction. They don't mention a hundred gallon per minute limit, no 40 pounds of copper limit. Even the operations manual that the plaintiffs held, that was given allegedly to the SD&CI employees after the consummation of the sale, had no such limit. So certainly the government had a right to use the PITT system subject only to the limitation that we could not reconstruct it. Subject to what? That we could not reconstruct. Judge Newman, you asked a question as to whether we had resized the entire limit, and the government did not. What the government received was a 2,000 gallon reaction tank, a huge reaction tank. We just took advantage of the fact that we could flow more influence through that particular tank. The government never touched the reaction tank, which basically contains many of the claim limitations in both the 407 claims and the 800 claims that are at issue in this case.  The inlet pipe was changed and the outlet pipe was changed to basically send more water into that treatment unit. That doesn't sound like repair, does it? It doesn't. If you look at the Supreme Court case, the Wilmer Ellis case that was mentioned... Well, these are fact-dependent, but this, it seems to me, that whatever they did went beyond simply enlarging, to simply producing more with the same equipment or with slight modifications. We actually, under the ISIS case, we actually did just use the same equipment to produce more. That is exactly what we did. The reaction tank where you have the introduction of influence and neutralizer and air, we did not change that except to shut the air off, which basically takes it out of reading on any claim that either of the patents ensued, but the duration was not necessary. But other than that, we did not change anything within the reaction tank. We basically used what we had been provided. The only thing is we were able to flow more water through that tank because it certainly, a 2,000 gallon tank has a huge capacity. We were able to treat more water through that tank. Because we treated more water, we added more sponge handling capability on the other end of that. Certainly, we did not change, the majority of the limitations were not changed at all in the PIT system. Certainly, we did shut off the air, which takes it out of the ambit of any of the claims that were presented to the court for infringement. There's also, within the PIT system, there's other, within the reaction tank, there was no internal piping as required by this court's, by the trial court's opinion on claim construction. There's many other limitations missing. There's no juxtaposition of the influence in the air, and the mixing, and the neutralizer in a contained area of the tank, or even near each other in the tank, much less in a contained area of the tank. The claim isn't limited to the tank, however. No. The majority of the claim limitations are involved within that reaction tank, and there are some de-watering limitations after the effluent is treated. But certainly, the majority of the claim limitations do involve the reaction tank, and the government did not change that except to shut off the air. I'd like to address Judge Schall's questions on whether the trial court's factual findings were clearly erroneous, and certainly the government contends that was not the case. One of the problems with the plaintiffs' argument is that they continue to rely on Mr. Stevens' testimony to establish infringement in reading through the brief for all the water treatment plants. His testimony is relied upon for establishing infringement, and the trial court found that testimony simply incredible. And this is especially true for the water treatment plant, where the only reliance is on Mr. Stevens' testimony in the plaintiff's trial brief. The most fundamental problem with the plaintiffs' argument is that they failed to go to prove or try to establish infringement on a limitation-by-limitation basis for any claim that either of the patents ensued. And certainly, for the document of equivalence, they failed to provide any linking evidence to show that one particular limitation was substituted with another that was basically an insubstantial substitution. And in fact, the government affirmatively showed that many of the limitations were missing for all the water treatment plants. And certainly, for the document of equivalence argument, the government, and this was not reached by the trial court, but there is a prosecution history, a small argument that the government did raise with the trial court that key limitations involving the dispossession of influent era neutralizer in the 497 patent and also in the 800 patent, the simultaneous aspect in the water treatment tank was added to overcome prior art. And there's no range of equivalence during those particular limitations. And the plaintiffs did not address this argument at all. Turning to the other three water treatment plants, the French drain treatment plant, the proxy water treatment plant, and the water treatment plant, the court clearly found the way the evidence for the French drain treatment plant found that there was no evidence of air introduced into that particular unit, actually no evidence of any mixtures, which is also required by all the claims that issue, found that there was no evidence of a rate of aeration. And let me address that particular issue. The idea that the rate of aeration would be satisfied by just exposure to ambient air is merely a turning argument. There's nothing in the record to show that just merely exposure to air creates an oxidation reaction. In fact, the testimony was such from the expert, Dr. Letterman, that if you expose, say, any type of water to ambient air, that that particular body of water has already been fully oxidized. There will be no diffusion of air across that gradient. There will be no oxidation. There will be no dissolved oxygen concentration at all that results from that exposure. And there was much evidence presented in trial that a lot of the treatment units were receiving water that had been sitting out and had been exposed to air and was most likely saturated with oxygen, and therefore air was not necessary. Certainly for the proxy water treatment plant and the French drain treatment plant, the majority of the evidence in the courts had found way to evidence that there was no air used at all. The water treatment plant, the government did use air in a couple of the iterations of that treatment plant, but air was found to be unnecessary and was turned off. And the conclusion is, when you're treating water from this huge cement-filled dam impoundment that's a nice ruby-red color that's been exposed to air, the iron has already been oxidized, there's no need for any additional oxidation. All you need is some neutralization, and it's off the metals now. So therefore, the oxidation reaction isn't even necessary in the water treatment plant. And certainly the government affirmatively showed at trial that that limitation was missing, that we really didn't have aeration in any of the water treatment plants. Certainly in the argument that Mr. King made concerning the court's opinion that aeration is not necessary in the 800 patent, that is merely a misreading of what the court stated. The court said that the particular ranges that were presented in the claim were ranges where someone of skill in the art could determine what the rate of aeration would be, but that those particular ranges could be scaled up or scaled down depending on the needs of your plant, so they were not limitations in terms of you can only put 50 gallons per minute through your treatment unit if you got above the range that was expressed in the claim. You somehow can be out of the range of the claim if you provided the proper dissolved oxygen concentration. The judge never, ever read out aeration as a limitation of that claim, and certainly never stated that ambient air would be a proper substitute for aeration. In fact, the only testimony at trial from a credible expert, Dr. Levin, was that aeration to him meant that you had to have some type of engineered air to put air into the system. As the trial court indicated, this is not a closed case. There is no clear error that has been shown by the plaintiffs in this case. I think I really would ask that this court affirm the judgment of the court below. Thank you. Thank you, Ms. Mitchell. Mr. Kenney? Thank you, Your Honor. Real quickly, I draw your attention to the contradictory statement that you just heard from the government. They tell you that this rate of aeration wasn't—I misread it, I misinterpreted it, because it's not a limitation, but there has to be some aeration. But then they say to you, well, we're pulling from this Somerville Dam impoundment where the metals are precipitating and oxidizing by virtue of exposure to ambient air, such that when they're being treated, they don't require oxidation, further oxidation. That doesn't take it without the patent. It doesn't make it non-infringement. The patent doesn't require a specific rate of aeration, only that it exists. And 0.1 pounds per hour is effectively nothing. It's effectively air in an ambient tank. In the trial court's opinion on, I believe it was the Markman validity, he noted the following. Mr. DuPont was their expert at that time. And speaking of this rate of aeration, the court stated, thus the available intrinsic evidence supports the interpretation that the language in question, 0.01 per hour, et cetera, in Claim 1 of the 800 patent, combined with the associated ranges for metal concentrations and flow rates, defines a rate of aeration. Support for this interpretation is found in the intrinsic evidence received by the court. He then goes on to discuss our expert's position. And then he says, for his part, Mr. DuPont rejected the idea that the reference language referred to a particular dissolved oxygen concentration or a particular aerator rating. The aerator at issue was the 497 specific aerator, aeration industries aerator, which ran on a pump. Instead, he candidly agreed that the most likely interpretation of the language was as a reference to a rate of aeration, one that would lead to the proper oxidation of the waste stream. Mr. DuPont, however, discounted this interpretation. After admitting it, he discounted it. Based on his view that one skilled in the art would recognize that some wastewater metal concentrations, contaminants, rather, might not need to be aerated at all to be precipitated. In his testimony at the Markman hearing, however, he never suggested that the presence of some minimal amount of oxygen, for example, had obtained at an oxidation rate of 0.01 pounds per hour, would prevent the precipitation of such contaminants. Consequently, on the whole, even Mr. DuPont grudgingly agreed that the most likely interpretation of the language in question was that it referred to a rate of aeration. And it's not a limitation, according to the trial court's opinion. So, the trial court is making clearly erroneous findings of fact when it's premising its entire factual finding, in part, on my meeting a limitation that doesn't exist. Secondly, on the point of the increased capacity of the pit system. There's no dispute that this is a 2,000 gallon tank. And there's no dispute that, had they not touched it at all, they could have put more water through it. But the reality is that they created larger pipes and replaced the larger pipes, didn't repair them, completely replaced them, to effectively duplicate the capacity of this machine to move more water through it beyond its design limitations. On the court's discussion that we were meeting, that we were aware that this judicial admission that they've conceded in summary judgment, and the trial court twice recognized, and the trial court's footnote 34 where it said, we recognize that this was an issue to be tried. As trial counsel standing before this court, when a trial court tells me that despite this judicial admission, he's going to receive evidence on it, I have no choice but to submit evidence on it. I have to meet that burden. I've been told by the court to do it. It does not change the operative effect of their judicial admission memorialized by the court. Finally, on that point, Judge Lowry, I would just point out this express Mr. Kennedy, you mispronounced my name once, I go over it. You mispronounce it twice, I skip it. The name is Lowry. Lowry. I've been on the court 17 years. My apologies. Judge Lowry. Thank you. The express limitation may not be memorialized in a specific contractual agreement, but it is memorialized throughout this entire litigation by the witnesses, by the fact that everybody agreed and was judicially admitted that this was 100 gallons per minute, 40 pounds of coffee, and they exceeded that limitation, that express limitation. Thank you, Your Honors. Thank you, Mr. Kennedy. Thank you, Ms. Mitchell. The case is taken into submission. Thank you.